Darius **MORGAN**, Petitioner–Appellant,

v.

**Floyd BENNETT, Superintendent, Elmira Correctional Facility,** Respondent–Appellee.

**Docket No. 98–2686**

United States Court of Appeals, Second Circuit.

Argued: Oct. 20, 1999

Decided: Feb. 28, 2000

Harry Jho, New Haven, Connecticut (Brett Dignam, The Jerome N. Frank Legal Services Organization, New Haven, Connecticut, on the brief), for Petitioner-Appellant.

Camille O'Hara Gillespie, Assistant District Attorney, Brooklyn, New York (Charles J. Hynes, District Attorney for

Kings County, Roseann B. MacKechnie, Assistant District Attorney, Brooklyn, New York, on the brief ), for Respondent–Appellee.

Before: KEARSE, MINER, and LEVAL, Circuit Judges.

KEARSE, Circuit Judge:

Petitioner Darius Morgan, a New York State ("State") prisoner convicted of murder and attempted murder, appeals from a judgment of the United States District Court for the Eastern District of New York, Edward R. Korman, *Judge*, denying his petition pursuant to 28 U.S.C. § 2254 (1994 & Supp. II 1996) for a writ of habeas corpus alleging principally that his Sixth Amendment right to counsel was infringed when the trial court ordered his attorney not to disclose to him that a certain witness was to testify on the following day. Morgan also alleged, *inter alia,* that his Sixth Amendment right to confront the witness was abridged by other rulings of the trial court. The district court held that the trial court's instruction to Morgan's attorney was not impermissible and ruled that Morgan's confrontation claim was procedurally barred. Morgan challenges these rulings on appeal. For the reasons that follow, we reject his assistance-of-counsel claim, and we affirm the denial of his petition to the extent that it dismissed that claim. However, we conclude that his confrontation claim is not procedurally barred, and we vacate and remand for further proceedings with respect to that claim.

## I. BACKGROUND

During the early morning hours of February 27, 1987, in an apartment in Brooklyn, New York, Denise Hill was shot and wounded; her friend Rachel Layne was shot and died shortly thereafter. Hill had known Morgan prior to these events, having bought drugs from him and having begun a sexual relationship with him. While hospitalized after the shooting, Hill selected Morgan's picture from a photographic array, identifying him as the shooter. Morgan was arrested and charged with murder and attempted murder. Hill was scheduled to testify at his trial.

Prior to trial, Morgan moved to suppress Hill's identification testimony. At a suppression hearing held on May 15, 1989, Hill described her relationship with Morgan and gave a more detailed account of the above events. The court denied the motion to suppress.

A. *The Events Preceding Hill's Testimony at Trial*

On May 30, 1989, after Morgan's trial had begun but before Hill testified, a court officer informed the court that Morgan had spoken to Hill outside of the courtroom, stating "You look good," and asking her, "Are you with me or what?" (Trial Transcript ("Tr.") 162–63.) Although Morgan's attorney stated that Morgan had merely nodded at Hill, the court admonished Morgan and warned him against further attempts at communication.

Later that day, Hill was called to testify. Shortly before she was to be brought into the courtroom, however, she stated that she would not take the witness stand, and she threatened to "take the fifth" unless she could speak with prosecutors. (Tr. 231–32.) Thereafter, in a conference conducted outside the presence of Morgan and the jury, the prosecutor informed the court that Hill was "terrified of testifying against" Morgan and "feared for her family's safety and especially the safety of her daughter." (Tr. 233.) The prosecutor stated that, according to Hill (who was herself then incarcerated on an unrelated charge), two associates of Morgan, "Charles Brown," better known as "Chucky," and "Marty," had visited her in jail and said they knew that she was to be the principal witness at Morgan's trial. They stated that Morgan was "facing too much time" and "proceeded to ask her about her eight-year old daughter" in a

way that Hill found disturbing. (Tr. 234.) On other occasions, Marty had approached Hill's mother and sister in a threatening manner. (Tr. 235.)

The prosecutor requested that the proceedings be adjourned for the day so that she could prepare a motion for a "*Sirois* hearing," *i.e.*, a hearing to determine whether a witness's unavailability or unwillingness to testify was caused by misconduct on the part of the defendant, such that "the defendant will be deemed to have waived any objection to the admissibility of the witness' prior Grand Jury testimony and said testimony may be admitted as direct evidence at the defendant's trial." *Holtzman v. Hellenbrand*, 92 A.D.2d 405, 415, 460 N.Y.S.2d 591, 597 (2d Dep't 1983) (per curiam). Over Morgan's objection, the court granted the adjournment.

On the following morning, in a conference from which Morgan was excluded, the court notified counsel that it had been informed by a court officer that after the previous day's adjournment, Morgan had blown a kiss to Hill as he was being returned to his holding cell, and said, "I love you too. You don't have to worry about nothing. You took good care of it." (Tr. 249–50.) After the court officer was questioned, the prosecutor elaborated on the fears that had been expressed by Hill. According to Hill, Chucky and Marty had visited her in jail after she testified at the suppression hearing. They told her that if she testified at trial, they could not guarantee that nothing would happen to her family. They stated that they could, however, guarantee that nothing would happen to her family if she did not testify.

Following a luncheon recess, the conference resumed and the prosecutor reported that Hill remained concerned for her safety but was wavering about whether or not to testify.[*] The court decided to grant the motion for a *Sirois* hearing, and it instructed the prosecutor to have her other witnesses brought to court. After calling her office, the prosecutor informed the court that Hill had now indicated that al-though she "was still afraid . . . she would take the stand and testify." (Tr. 280.) Because the court had not yet obtained counsel to represent Hill in connection with the possible invocation of her Fifth Amendment privilege against self-incrimination, however, Hill could not be called to testify until the next day. The court decided to begin the *Sirois* hearing in case Hill changed her mind a third time and refused to testify. The court noted that if Hill testified the following morning, the hearing would be abandoned as unnecessary.

Before adjourning the conference and opening the *Sirois* hearing, the court instructed Morgan's counsel "not to discuss with your client . . . that Miss Hill may take the stand tomorrow once the jury is brought up and may testify in connection with the trial proper." (Tr. 284.) The court stated that the revived expectation that Hill would testify was "[t]he only thing I am directing you not to discuss with your client." (*Id.*) Although counsel objected and argued that the restriction was improper, he stated that he would comply.

The *Sirois* hearing was begun that afternoon, with Morgan present. One witness, a police detective, described in detail Hill's fears and the threats Hill had reported receiving from Morgan and his associates. As it turned out, however, the *Sirois* hearing was not completed because on the following morning, June 1, Hill testified.

### B. *Hill's Testimony and the Proposed Impeachment Evidence*

To the extent pertinent here, Hill testified at trial that she had gone to the apartment on February 23, 1987, to buy drugs and had remained there through the early morning hours of February 27, when the shootings occurred. With her at the apartment were Morgan, Layne, and a man known to Hill as "Monk." In the wee hours of February 27, Hill, Layne, Monk,

364

and Monk's brother Randy were in the living room of the apartment smoking crack cocaine.

Between 6:00 and 6:30 a.m., Morgan briefly left the apartment, returning in a state of agitation because he could not find his car and asking what had happened to it. When no one could provide an answer, Morgan said, "Y'all don't tell me what happened to my car, I'm going to murder everybody in here." (Tr. 364.) He asked Monk and Randy, "If I murder, if I knock them off, would y'all tell on me?" (*Id.*) After Monk and Randy said they would not, Morgan pulled out a gun and shot Hill in the knee and back. He shot and wounded Layne, who vainly sought refuge in another room; she was pursued by Morgan who shot her repeatedly, inflicting wounds that proved to be fatal. Morgan then fled the apartment.

Hill testified that Monk then told her not to mention Morgan's involvement to anyone and to say that the shooting was drug-related. Hill obeyed this instruction when she was first interviewed after the shootings, stating that the crimes had been committed by unidentified persons who had entered the apartment. Only thereafter did she describe the events above and disclose that Morgan was the shooter.

In cross-examining Hill, defense counsel attempted to ask whether anyone had threatened Hill or forced her to testify. The court disallowed that line of questioning, expressing concern that it would raise "a hornet's nest in connection with threats." (Tr. 476–77, 480.)

Defense counsel also informed the court that he wished to call a witness who would testify that the district attorney had forced Hill to testify. Thereafter, in a "preliminary offer of proof," counsel stated that Gladstone Smith, an inmate at Rikers Island, would testify that Hill had told her that Layne's stepmother was "forcing her to testify; that she didn't want to testify; and as a result of their forcing her, she was going on the stand, but she was not comfortable going on the stand because

she was saying things that weren't true." (Tr. 523–24.) The court stated that it believed the issue would be "collateral" (Tr. 526); however, without ruling that Smith would be allowed to testify, it signed a subpoena so that defense counsel could bring Smith into court. On the following day, notwithstanding the subpoena, Smith was not produced in court, and defense counsel requested a continuance. The court concluded that the issue to which Morgan sought to have Smith testify—that Hill had been pressured to deliver fabricated testimony—was collateral and unsupported, and it therefore refused to grant a continuance. The defense rested without calling any witnesses.

The jury found Morgan guilty of murder in the second degree and attempted murder in the second degree. He was sentenced to 25–years–to–life imprisonment for the murder and 10–20 years for the attempted murder, to run consecutively to each other and to a prison term that he was then serving on an unrelated conviction. The Appellate Division affirmed Morgan's conviction, and leave to appeal to the New York Court of Appeals was denied. *See People v. Morgan,* 176 A.D.2d 359, 574 N.Y.S.2d 592 (2d Dep't 1991), *lv. denied,* 79 N.Y.2d 861, 580 N.Y.S.2d 733, 588 N.E.2d 768 (1992).

### C. *The Present Proceeding*

Morgan filed his present petition for a writ of habeas corpus in 1996, asserting a variety of claims. Those pertinent to this appeal are his contention that he was unconstitutionally deprived of unrestricted access to his attorney for a lengthy period, in violation of the principle established in *Geders v. United States,* 425 U.S. 80, 91, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), and his contention that his right to confront Hill was abridged by the restriction of his cross-examination of her and the exclusion of the impeaching testimony anticipated from Smith.

In a Memorandum and Order dated May 27, 1998, the district court denied the petition. *See* 1998 WL 315135 (E.D.N.Y.). The court rejected Morgan's assistance-of-counsel claim on its merits. *See id.* at *5–7. Although the court stated that a complete ban on counsel-defendant communications for a lengthy period would have been unconstitutional, it noted that

> the prohibition in this case did not prevent defendant from conferring with his counsel "altogether." *Perry [v. Leeke,* 488 U.S. 272, 280, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989)]*, (citing *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Indeed, it did not preclude petitioner from seeking any advice or guidance from his lawyer, and his lawyer was free to discuss anything relating to the trial except the fact that Denise Hill was again likely to testify. This restriction was justified by the prior threats against Denise Hill.

1998 WL 315135, at *6. As discussed in greater detail in Part II.B. below, the district court ruled that Morgan's confrontation claim of impermissible preclusion of evidence as to the alleged pressures on Hill to testify was procedurally barred. *See id.* at *7–12.

The court denied the habeas petition in its entirety but granted a certificate of appealability with respect to the issues of (1) whether Morgan was unconstitutionally deprived of his right to confer with counsel, and (2) whether Morgan properly preserved his challenges to the trial court's exclusion of the proposed cross-examination of Hill and the impeachment testimony he proposed to elicit from Smith. *See id.* at *12.

## II. DISCUSSION

On appeal, Morgan pursues the assistance-of-counsel and confrontation claims as to which a certificate of appealability was granted. For the reasons that follow, we conclude that the assistance-of-counsel claim lacks merit and that the confrontation claim should not have been dismissed for lack of exhaustion.

### A. *The Prohibition Against Counsel's Informing Morgan that Hill Was Again Scheduled To Testify*

 A defendant in a criminal trial is guaranteed not just the right to be represented by counsel but the right to the effective assistance of counsel. *See, e.g., United States v. Cronic,* 466 U.S. 648, 654, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *Strickland v. Washington,* 466 U.S. 668, 685–86, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Accordingly, the court may not properly restrict the attorney's ability to advise the defendant unless the defendant's right to receive such advice is outweighed by some other important interest.

In *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), and *Perry v. Leeke,* 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989), the Supreme Court considered Sixth Amendment claims of interference with the right to effective assistance of counsel in the context of instructions that a defendant and his attorney not confer during a recess that interrupted the defendant's trial testimony. In *Geders,* the interruption occurred when the trial was adjourned for the day, and the prohibition thus covered an approximately 17–hour period through the resumption of trial on the following day; in *Perry,* the recess took place during the trial day and was of 15 minutes' duration.

In both cases, the Supreme Court noted that most witnesses may be ordered not to confer with counsel during an interval in which their trial testimony is interrupted. As the *Geders* Court observed, the purposes of such an order are principally to

> exercise[ ] a restraint on witnesses "tailoring" their testimony to that of earlier witnesses; ... [to] aid[ ] in detecting testimony that is less than candid .... [and to] prevent[ ] improper attempts to influence the testimony in light of the testimony already given.

425 U.S. at 87, 96 S.Ct. 1330. As the *Perry* Court elaborated,

> it is entirely appropriate for a trial judge to decide, after listening to the direct examination of any witness, whether the defendant or a nondefendant, that cross-examination is more likely to elicit truthful responses if it goes forward without allowing the witness an opportunity to consult with third parties, including his or her lawyer.

488 U.S. at 282, 109 S.Ct. 594.

In light of an accused's Sixth Amendment right to counsel, however, that method of forestalling the coaching or tailoring of testimony is limited when the witness is the defendant in a criminal proceeding. In *Geders,* the Court concluded that an order "prevent[ing the defendant] from consulting his attorney during a 17–hour overnight recess, when an accused would normally confer with counsel," was too great a restriction in light of the interest that the trial court sought to protect. 425 U.S. at 91, 96 S.Ct. 1330. The Court noted that "[t]here are other ways to deal with the problem of possible improper influence on testimony or 'coaching' of a witness short of putting a barrier between client and counsel for so long a period as 17 hours." *Id.* at 89, 96 S.Ct. 1330. The trial court could in many instances, for example, eliminate the recess or prolong the day's session and require that the testimony continue without interruption. Or, the prosecutor could, within appropriate limits,

> cross-examine a defendant as to the extent of any "coaching" during a recess.... Skillful cross-examination could develop a record which the prosecutor in closing argument might well exploit by raising questions as to the defendant's credibility, if it developed that defense counsel had in fact coached the witness as to how to respond on the remaining direct examination and on cross-examination.

*Id.* at 89–90, 96 S.Ct. 1330. The *Geders* Court concluded that in light of the other methods for countering the possibility of coaching, the lengthy overnight ban imposed on communications between Geders and his attorney was impermissible:

> To the extent that conflict remains between the defendant's right to consult with his attorney during a long overnight recess in the trial, and the prosecutor's desire to cross-examine the defendant without the intervention of counsel, with the risk of improper "coaching," the conflict must, under the Sixth Amendment, be resolved in favor of the right to the assistance and guidance of counsel....
>
> .... We hold that an order preventing petitioner from consulting his counsel "about anything" during a 17–hour overnight recess between his direct and cross-examination impinged upon his right to the assistance of counsel guaranteed by the Sixth Amendment.

*Id.* at 91, 96 S.Ct. 1330. The *Geders* Court noted that it did not need to, and did not, deal with limitations imposed in other circumstances.

In *Perry,* the Court concluded that the trial court's order that the defendant not consult with his attorney during a 15–minute recess was permissible:

> [T]he Federal Constitution does not compel every trial judge to allow the defendant to consult with his lawyer while his testimony is in progress if the judge decides that there is a good reason to interrupt the trial for a few minutes.

488 U.S. at 284–85, 109 S.Ct. 594. The Court distinguished *Geders* on the basis that a long, overnight recess such as was at issue there would normally be used for discussion of a number of other important matters, and a ban during such a period, covering communication on all topics, was too severe a restriction:

> [T]he normal consultation between attorney and client that occurs during an overnight recess would encompass matters that go beyond the content of the

defendant's own testimony—matters that the defendant does have a constitutional right to discuss with his lawyer, such as the availability of other witnesses, trial tactics, or even the possibility of negotiating a plea bargain. It is the defendant's right to unrestricted access to his lawyer for advice on a variety of trial-related matters that is controlling in the context of a long recess. See *Geders v. United States,* 425 U.S. at 88, 96 S.Ct. 1330. The fact that such discussions will inevitably include some consideration of the defendant's ongoing testimony does not compromise that basic right.

488 U.S. at 284, 109 S.Ct. 594. The *Perry* Court concluded that, in contrast, "in a short recess in which it is appropriate to presume that nothing but the testimony will be discussed, the testifying defendant does not have a constitutional right to advice." *Id.* The Court also noted that, "[a]lternatively, the judge may permit consultation between counsel and defendant during such a recess, but forbid discussion of ongoing testimony." *Id.* n. 8.

■ We conclude that *Geders* and *Perry* stand for the principle that the court should not, absent an important need to protect a countervailing interest, restrict the defendant's ability to consult with his attorney, but that when such a need is present and is difficult to fulfill in other ways, a carefully tailored, limited restriction on the defendant's right to consult counsel is permissible.

In the present case, the problem addressed by the state trial court's limited gag order was far more troubling than the possibility of witness coaching involved in *Geders* and *Perry,* for intimidation of witnesses raises concerns for both the well-being of the witness and her family and the integrity of the judicial process. Such safety concerns have been held to justify a number of other types of intrusions on a defendant's normal access to information. For example, the court may properly allow the government to withhold the identity of persons who have furnished information of criminal activities to law enforcement officials where there is a legitimate concern for the safety of the informant. *See, e.g., Roviaro v. United States,* 353 U.S. 53, 59–62, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); *United States v. Napolitano,* 761 F.2d 135, 139 (2d Cir.), *cert. denied,* 474 U.S. 842, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985). Or, on a similar showing of concern for a witness's safety, the witness's address, generally an appropriate subject of defense inquiry, *see, e.g., Smith v. Illinois,* 390 U.S. 129, 131, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), may properly be withheld, *see, e.g., United States v. Cavallaro,* 553 F.2d 300, 304 (2d Cir.1977). For similar reasons, the trial court may sometimes empanel an anonymous jury. *See, e.g., United States v. Thai,* 29 F.3d 785, 800–01 (2d Cir.) (anonymous jury justified by evidence of the defendants' acts of intimidation toward their crime victims, their attempts to kill certain of those victims, the murder of one robbery victim because of his refusal to retreat from his complaints to the police, and the fact that many members of the defendants' gang remained at large), *cert. denied,* 513 U.S. 977, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994).

Nor is the interest in the integrity of the judicial process so easily protected when the danger is that the defendant will so intimidate the witness that she either decides to give testimony that is false, incomplete, or misleading, or refuses to testify at all. If the defendant's intimidation causes the witness to give false or misleading testimony, cross-examination may or may not bring out the truth. But in either event the record will contain false evidence whose effect may be to produce an unjust decision.

If the defendant's intimidation causes the witness not to testify, the loss of her testimony may, to a degree, be offset by the introduction of the witness's prior grand jury testimony, *see, e.g., United States v. Mastrangelo,* 693 F.2d 269, 272–73 (2d Cir.1982), or of hearsay evidence

from a law enforcement officer or a prosecutor as to the witness's prior unsworn statements, *see, e.g., United States v. Aguiar,* 975 F.2d 45, 46–47 (2d Cir.1992). However, the admission of such prior statements may well be an inadequate substitute for the witness's live testimony, and we consider it well within the proper bounds of the trial court's discretion to attempt instead to forestall the witness intimidation. Most recently, in *United States v. Padilla,* 203 F.3d 156 (2d Cir. 2000), this Court has upheld a district court's order temporarily barring counsel from informing their clients of the existence of an ongoing investigation into allegations of witness and jury tampering. *See also id.* (investigation was revealed to the defendants when it became relevant to their witness-selection decisions and to the nature of the cross-examination that could be expected if the defendants themselves were to testify).

■ We conclude that valid concerns for the safety of witnesses and their families and for the integrity of the judicial process may justify a limited restriction on a defendant's access to information known to his attorney.

■ In the present case, the record included evidence that Hill had complained to the prosecutor or to law enforcement agents that associates of Morgan visited her in mid-May following her suppression hearing testimony and indicated that her family would be harmed if she testified against Morgan at trial; that on May 30, the day Hill was first scheduled to testify, Morgan had asked her, "Are you with me or what?" (Tr. 162); and that later that day, after Hill initially declined to testify, Morgan told her, "You don't have to worry about nothing. You took good care of it" (Tr. 249–50). The evidence was ample to cause concern that Morgan had engaged in, and was continuing to engage in, attempts to intimidate Hill into not testifying.

The restriction imposed on Morgan to alleviate that concern was substantively quite limited. Though the nondisclosure order covered an overnight recess, it dealt with a single fact: that Hill, after her second change of heart, was expected to testify the following day. There was no blanket prohibition against communication between Morgan and his attorney; there was no restriction on their ability to discuss any other facet of the case. It does not seem likely that the order would have caused any impairment of defense counsel's preparation for Hill's testimony. Hill had been called to testify on May 30, and presumably defense counsel had been prepared to cross-examine her that day. Nor was there any impairment of the ability of Morgan—who was present at the *Sirois* hearing—to defend against the allegations that he and his associates had engaged in intimidation attempts. The only restriction imposed was that counsel not inform him that those attempts would apparently be unsuccessful.

We do not see that other types of restrictions would have sufficed in the circumstances of this case. Morgan's messengers remained at large, and the whereabouts of Hill and her family were obviously known to them. There was no possibility of simply continuing with the trial without a recess until Hill could testify, for Hill required representation of counsel with respect to the potential invocation of her privilege against self-incrimination, and the court had not yet succeeded in obtaining counsel for her.

Given the evidence of threats to and intimidation of Hill by Morgan and his associates, and the circumstances of the case, we conclude that the trial court's order that counsel simply not inform Morgan that Hill had decided to testify after all was not an unreasonable application of the principle established in *Geders* and *Perry.* Accordingly, we affirm the district court's rejection of Morgan's assistance-of-counsel claim.

B. *Exhaustion of the Confrontation Claim*

With respect to Morgan's contention that his confrontation right was violated by the trial court's precluding him from calling Smith as a witness and from cross-examining Hill as to whether her inculpating testimony was the product of threats and coercion, we disagree with the district court's view that that claim had not been exhausted.

█ The exhaustion requirement imposed by 28 U.S.C. § 2254(b)(1) means generally that before seeking a writ of habeas corpus in federal court, a state prisoner must first have presented his claim to the highest court of the state. *See, e.g., Grey v. Hoke,* 933 F.2d 117, 119 (2d Cir.1991); *Pesina v. Johnson,* 913 F.2d 53, 54 (2d Cir.1990) (per curiam). In New York, a defendant who has appealed his conviction to the Supreme Court's Appellate Division may seek review of his conviction by applying to the Court of Appeals for a certificate granting leave to appeal. *See* N.Y.Crim. Proc. Law § 460.20 (McKinney 1994). Under court rules, the initial application is to be sent to the Chief Judge, who then assigns the application to a particular judge. *See* N.Y. Ct. Rules § 500.10 (McKinney 1999). The Clerk of Court thereafter informs the defendant or his attorney which judge has been assigned the application; supplemental arguments, if any, are usually sent directly to the judge so designated.

█ In order to exhaust his claim before the state's highest court, a defendant must give that court a fair opportunity to pass on his federal claim. *See, e.g., Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Wilwording v. Swenson,* 404 U.S. 249, 250, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971) (per curiam); *Grey v. Hoke,* 933 F.2d at 119; *Daye v. Attorney General,* 696 F.2d 186, 190–92 (2d Cir. 1982) (en banc). In *Grey v. Hoke,* we considered a petitioner who had sent the Court of Appeals a letter requesting leave to appeal; his letter mentioned only one claim, and it attached his Appellate Division brief which had argued that claim along with two others. We held that the submission was insufficient to inform the Court of Appeals that leave was being sought with respect to claims other than the sole claim mentioned in the letter.

> The fair import of petitioner's submission to the Court of Appeals ... was that the other two [claims] had been abandoned. The only possible indication that the other two claims were being pressed was the inclusion of a lengthy brief originally submitted to another court. This did not fairly apprise the court of the two claims. We decline to presume that the New York Court of Appeals has "a duty to look for a needle in a paper haystack."

933 F.2d at 120 (quoting *Mele v. Fitchburg District Court,* 850 F.2d 817, 822 (1st Cir. 1988)).

In the present case, Morgan appealed his conviction to the Appellate Division, asserting contentions in a brief filed by his new counsel, Rosali Vazquez of the Legal Aid Society, and in a supplemental brief filed *pro se.* The *pro se* brief included the contentions that the trial court had improperly precluded Morgan from impeaching Hill with questions as to whether the prosecution was forcing her to testify untruthfully and improperly refused to allow him to present the testimony of Smith. After the Appellate Division affirmed, Morgan sought leave to appeal to the New York Court of Appeals, in a letter from his attorney to the Chief Judge. After briefly describing the judgment of conviction and the Appellate Division's affirmance, the letter concluded as follows:

> I am enclosing copies of the briefs filed in the Appellate Division and that Court's order and opinion. Please advise me of the judge designated to decide this application so that I may send that judge a follow-up letter in support of the application. We request this Court to consider and review *all issues*

*outlined in defendant-appellant's* brief and *pro se supplemental brief.*

(Letter from Rosali Vazquez to Chief Judge Sol Wachtler, dated October 10, 1991 ("Vazquez's October 10 Letter"), at 1–2 (emphasis added).)

Thereafter, Vazquez was informed in a letter from the Clerk of the New York Court of Appeals that Morgan's case had been assigned to Associate Judge Stewart F. Hancock, Jr. The letter continued:

> Any papers to be relied on in furtherance of your application, such as supplemental arguments or a request for an oral hearing, should be in letter form sent directly to the Judge named above unless they have already been forwarded with the application.

(Letter from Donald M. Sheraw, Clerk of the New York Court of Appeals, to Rosali Vazquez, dated October 17, 1991 ("Court Clerk's Letter").) After receiving the Court Clerk's Letter, Vazquez sent Judge Hancock a follow-up letter, which began by stating that "[t]he question presented by this case is whether the court deprived appellant of his right to counsel when it prevented counsel from communicating with appellant overnight regarding the complaining witness's decision to testify." (Letter from Rosali Vazquez to Judge Stewart F. Hancock, Jr., November 7, 1991 ("Vazquez's November 7 Letter"), at 1). After discussing that issue, Vazquez stated that she

> would also like to draw your Honor's attention to Point I G in appellant's supplemental *pro se* brief [which concerned Morgan's alleged right to be present at the questioning of the second court officer who reported comments by Morgan to Hill]. After appellant filed his *pro se* brief, this Court ruled in *People v. Turaine,* 78 N.Y.2d 871, 573 N.Y.S.2d 64, 577 N.E.2d 55 (1991), that a defendant had a right to be present at a hearing to elicit facts surrounding alleged intimidation so that the court could determine its admissibility at trial. It is appel-

lant's contention that *Turaine* mandates that he be given a new trial.

(Vazquez's November 7 Letter at 2.)

The State opposed Morgan's request for leave to appeal, arguing, *inter alia,* that "[t]he Appellate Division also properly concluded that ... the claims raised in [Morgan's] *pro se* supplemental brief did not warrant reversal." The Court of Appeals denied leave to appeal without comment. *See* 79 N.Y.2d 861, 580 N.Y.S.2d 733, 588 N.E.2d 768 (1992).

In addressing the confrontation claim asserted in Morgan's habeas petition, the district court, relying in part on *Grey v. Hoke,* concluded that the claim had been procedurally forfeited in light of Vazquez's November 7 Letter, ruling that the claim had not been fairly presented to the Court of Appeals. The district court stated:

> If there had not been a follow-up letter, this leave application could have arguably been sufficient to alert the Court of Appeals to the fact that petitioner sought leave with respect to each of the issues raised in the pro se supplemental brief. See Meatley v. Artuz, 886 F.Supp. 1009, 1013–14 (E.D.N.Y.1995) (holding that leave application which did not refer to any specific claim, but attached Appellate Division brief, "fairly presented" claims raised in Appellate Division to Court of Appeals). The November 7, 1991 letter, however, specifically addressed only two of petitioner's claims in a way that clearly suggested that these were the only issues on which leave was sought.

1998 WL 315135, at *8.

■ We disagree for several reasons. First, the present case differs significantly from *Grey v. Hoke,* in which the request for leave to appeal was made in a letter that mentioned one issue but did not mention two others as to which habeas relief was eventually sought. In the present case, in contrast, Morgan's initial letter to the Court of Appeals expressly "request[ed] this Court to consider and re-

view all issues outlined in defendant-appellant's brief and *pro se* supplemental brief" submitted to the Appellate Division. (Vazquez's October 10 Letter at 2.) That statement was sufficiently specific to alert the Court of Appeals that Morgan sought review of all of the issues raised in his *pro se* supplemental Appellate Division brief.

Second, we do not think it appropriate to infer that the New York Court of Appeals would construe counsel's second letter as eliminating issues as to which review had been expressly requested. The reference in the Court Clerk's Letter to "supplemental" arguments appears to indicate that follow-up letters would be considered in addition to, not in lieu of or as a limitation on, the issues raised in counsel's initial letter.

Finally, we think the substance of the second letter's reference to Point I G of the *pro se* brief made clear that that reference was meant simply as a supplement. In referring to that point, the letter simply called the Court's attention to a case that had been decided by the Court of Appeals "[a]fter appellant filed his *pro se* brief" (Vazquez's November 7 Letter at 2), and stated it was Morgan's contention that reversal was required by that new case.

Because counsel's initial letter expressly sought review of "all issues outlined in defendant-appellant's ... *pro se* supplemental brief" (Vazquez's October 10 Letter at 2), we conclude that Morgan fairly presented to the Court of Appeals the present confrontation claim, which was argued in his *pro se* supplemental brief, and thus satisfied the exhaustion requirement.

Whether the limitations that were imposed on the proposed cross-examination and impeachment of Hill infringed Morgan's right to confront his accuser is a matter that goes to the merits. The district court described this claim as "not without merit," 1998 WL 315135, at *4, although it "believe[d] that the line of questioning precluded by the trial judge would have been a disaster for petitioner," *id.* at *12. The court declined, however, to

"reach any final conclusion because a hearing may be required to at least determine what Denise Hill, if not Gladstone Smith, would have said if questioned." *Id.*

We are skeptical, for two reasons, of the need for further exploration as to Gladstone Smith. First, although admissible evidence as to whether Hill's testimony was fabricated would have been central to an assessment of her credibility, much of Smith's testimony as described in Morgan's offer of proof would have been collateral. Second, it is questionable whether any of Smith's testimony would have been admissible since there was no suggestion that she had any personal knowledge of the facts, and her testimony as to what Hill had told her would appear to be hearsay. In the circumstances, the trial court's denial of the continuance necessary to bring Smith to court seems well within the bounds of discretion.

We are also skeptical as to whether habeas could properly be granted on the confrontation claim with respect to the cross-examination of Hill. Hill herself, of course, could have been questioned as to the truth of her testimony; we cannot agree with the trial court's view that that issue was "collateral" (Tr. 526). However, it is hardly clear from the transcript pages cited to us by Morgan that the trial court was adequately apprised that the issue on which he wished to confront Hill was the truth or falsity of her testimony. Defense counsel asked Hill whether anyone had threatened or forced her to testify; but pressure merely to testify does not indicate pressure to falsify. Standing alone, therefore, defense counsel's question would not have elicited probative information; and it would surely, as the trial court indicated, have opened the door to devastating questioning by the prosecution as to threats by Morgan to prevent Hill from testifying. We leave it to the district court, in the first instance, to determine (a) whether defense counsel adequately alerted the trial court that the ultimate issue he

sought to probe in this line of questioning was the truthfulness or falsity of Hill's testimony (assuming that was his intention), (b) if so, whether the limitation on the cross-examination of Hill improperly abridged Morgan's right to test the truthfulness of Hill's testimony and to bring out her biases and motivation for her testimony, *see generally Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Davis v. Alaska,* 415 U.S. 308, 316–17, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and (c) if there was any constitutional error, whether it was harmless.

## CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed to the extent that it dismissed petitioner's claim that he was deprived of his right to the assistance of counsel, and is vacated to the extent that it dismissed the confrontation claim for lack of exhaustion. We remand for consideration of the confrontation claim on the merits.